# UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

ROWVAUGHN WELLS, Individually and as Administratrix Ad Litem of the Estate of Tyre Deandre Nichols, deceased.; CHASITY GRICE SHARP, Guardian Ad Litem of Minor Child,

       Plaintiffs-Appellees,

v.

CITY OF MEMPHIS, TN, a municipality,

       Defendant,

and

CERELYN DAVIS, Chief, in her official and individual capacity,

       Defendant-Appellant.

On Appeal from the United States District Court
for the Western District of Tennessee
Case No. 2:23-cv-02224

## BRIEF OF APPELLANT CHIEF CERELYN J. DAVIS

Bruce McMullen
Jennie Vee Silk
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, PC
165 Madison Avenue, Suite 2000
Memphis, Tennessee 38103
Telephone: (901) 526-2000
*Counsel for Appellant Chief Cerelyn J. Davis*

## CORPORATE DISCLOSURE

Defendant City of Memphis is a political subdivision of the State of Tennessee and, therefore, is not required to make a corporate disclosure under Fed. R. App. P. 26.1 and 6 Cir. R. 26.1.

Defendant-Appellant Chief Cerelyn Davis, ("Appellant" or "Chief Davis") is an individual, and also is not required to make a corporate disclosure under Fed. R. App. P. 26.1 and 6 Cir. R. 26.1.

**TABLE OF CONTENTS**

CORPORATE DISCLOSURE..................................................................................2

TABLE OF CONTENTS ....................................................................................3

TABLE OF AUTHORITIES................................................................................5

STATEMENT IN SUPPORT OF ORAL ARGUMENT............................................8

STATEMENT OF JURISDICTION ........................................................................9

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ...........................10

INTRODUCTION ...............................................................................................11

STATEMENT OF THE CASE...............................................................................11

    A.    Plaintiff-Appellee's Allegations Regarding the Incident Giving Rise to the Lawsuit ...................................................................................11

    B.    Plaintiff-Appellee's Allegations Regarding an Alleged "Run Tax" and "Code of Silence" Within MPD. .......................................................15

    C.    Plaintiff-Appellee's Allegations Regarding Chief Davis and MPD's SCORPION Unit. ..................................................................................16

    D.    Plaintiff-Appellee's Allegations Against Chief Davis, Individually. ..20

    E.    The Proceedings in the District Court. ................................................21

SUMMARY OF THE ARGUMENT .....................................................................23

STANDARD OF REVIEW ..................................................................................25

ARGUMENT ......................................................................................................28

    Chief Davis is Entitled to Qualified Immunity on Plaintiff-Appellee's Fourth Amendment Claim Because Plaintiff-Appellee Failed to Plausibly Plead that Chief Davis Committed a Constitutional Violation......................................28

I.    Plaintiff-Appellee Failed to Allege Any *Active* Unconstitutional Conduct by Chief Davis Regarding Mr. Nichols. ..........................................................30

II.    Plaintiff-Appellee Failed to Plead a Causal Link Between Chief Davis's Alleged Conduct and the Injuries Sustained by Mr. Nichols. .......................33

III.    Sixth Circuit Precedent Demonstrates the Insufficiency of Plaintiff's Allegations Regarding Chief Davis............................................................38

IV.    Plaintiff-Appellee Failed to Plead That the Alleged Unlawfulness of Chief Davis's Conduct Was Clearly Established at the Time of Her Conduct. ......44

V. *Peatross v. City of Memphis* Is Distinguishable from the Instant Case.........49

CONCLUSION .................................................................................................58

CERTIFICATE OF COMPLIANCE ...................................................................60

CERTIFICATE OF SERVICE ............................................................................61

ADDENDUM .....................................................................................................62

**TABLE OF AUTHORITIES**

Page(s)

**<u>Cases</u>**

*Anderson v. Creighton*,
483 U.S. 635 (1987) .................................................................................. 45, 49

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ......................................................................................Passim

*Bassett v. Nat'l Collegiate Athletic Ass'n*,
528 F.3d 426 (6th Cir. 2008) ................................................................... 18

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .................................................... 18, 25, 26, 32

*Casey v. Sanders*,
No. 7:17-CV-145-KKC, 2018 WL 3078758 (E.D. Ky. June 21, 2018)............... 54

*Coley v. Lucas Cty.*,
799 F.3d 530 (6th Cir. 2015) ....................................................... 46, 47, 54

*Crawford v. Tilley*,
15 F.4th 752 (6th Cir. 2021) ...................................................................Passim

*Crosby v. Twitter, Inc.*,
921 F.3d 617 (6th Cir. 2019) ...................................................................... 37

*D.C. v. Wesby*,
583 U.S. 48 (2018) ...................................................................... 29, 44, 45

*Doe v. City of Roseville*,
296 F.3d 431 (6th Cir. 2002) ...................................................................... 32

*Does v. Whitmer*,
69 F.4th 300 (6th Cir. 2023) ...................................................................Passim

*Essex v. Cty. of Livingston*,
518 Fed. Appx. 351 (6th Cir. 2013) ................................................... 33

*Franklin v. City of Southfield*,
No. 16-13140, 2018 WL 11224401 (E.D. Mich. Mar. 29, 2018) .................. 53, 54

*Garza v. Lansing Sch. Dist.*,
972 F.3d 853 (6th Cir. 2020) ...................................................... 32, 34, 43, 57

*Gregory v. City of Louisville*,
444 F.3d 725 (6th Cir. 2006) ...................................................................... 32

*Harlow v. Fitzgerald*,
457 U.S. 800 (1982) .................................................................................. 28

*Hays v. Jefferson Cty*,
668 F.2d 869 (6th Cir. 1982) ...................................................................... 54

*Heyerman v. Cty. of Calhoun*,
680 F.3d 642 (6th Cir. 2012) ...................................................................... 30

*In re Omnicare, Inc. Sec. Litig.*,
 769 F.3d 455 (6th Cir. 2014) .................................................................. 18

*James v. City of Detroit*,
 No. CV 17-10506, 2017 WL 5158740 (E.D. Mich. Nov. 7, 2017)................ 33, 54

*Lucas v. Chalk*,
 No. 118CV01211JDBCGC, 2021 WL 794436 (W.D. Tenn. Mar. 2, 2021)......... 55

*Malley v. Briggs*,
 475 U.S. 335 (1986) .......................................................................... 36, 44

*Mitchell v. Forsythe*,
 472 U.S. 511 (1985) ................................................................................ 9

*Monroe v. Pape*,
 365 U.S. 167 (1961) ............................................................................. 36

*Pearson v. Callahan*,
 555 U.S. 223 (2009) ............................................................................. 28

*Peatross v. City of Memphis*,
 818 F.3d 233 (6th Cir. 2016) ............................................................Passim

*Phillips v. Roane Cty.*,
 534 F.3d 531 (6th Cir. 2008) .................................................................. 30

*Powers v. Hamilton Cty. Pub. Def. Comm'n*,
 501 F.3d 592 (6th Cir. 2007) .................................................................. 36

*Royal Truck & Trailer Sales and Serv., Inc. v. Kraft*,
 974 F.3d 756 (6th Cir. 2020) .................................................................. 25

*Spencer v. Jordan*,
 No. 1:22-cv-557, 2023 WL 11878637 (S.D. Ohio Aug. 8, 2023) ................. 42, 43

*Sutton v. Metro. Gov't of Nashville & Davidson Cty.*,
 700 F.3d 865 (6th Cir. 2012) ................................................................. 9, 25

*Venema v. West*,
 133 F.4th 625 (6th Cir. 2025) ................................................................. 27

*White v. Pauly*,
 580 U.S. 73 (2017) .............................................................................. 49

*Whren v. United States*,
 517 U.S. 806 (1996) ............................................................................ 37

*Winkler v. Madison Cty.*,
 893 F.3d 877 (6th Cir. 2018) .................................................................. 34

**Statutes**
28 U.S.C. § 1291 ................................................................................... 9
42 U.S.C. § 1983 ................................................................................... 8

**Rules**

Fed. R. Civ. P. 8 .................................................................................................... 26

Fed. R. Civ P. 12(b)(6) ............................................................................. 21, 25, 27

Fed. R. Evid. 201 ................................................................................................ 18

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Defendant-Appellant Chief Cerelyn Davis, requests oral argument in this matter. Given the complexity of the legal issues presented—including the application of qualified immunity, the standards for supervisory liability under 42 U.S.C. § 1983, and the distinctions between this case and existing Sixth Circuit precedent such as *Peatross v. City of Memphis*—the parties would benefit from the opportunity to clarify their positions and respond to the Court's questions.

Oral argument will assist the Court in resolving whether the district court erred in denying Chief Davis's Motion to Dismiss on qualified immunity grounds, and whether Plaintiff-Appellee has plausibly alleged a violation of a clearly established constitutional right. Accordingly, Chief Davis requests that the Court grant oral argument in this appeal.

# STATEMENT OF JURISDICTION

Appellate jurisdiction in the Court of Appeals is proper under 28 U.S.C. § 1291 and *Mitchell v. Forsyth*, which states that "a district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment." *Mitchell*, 472 U.S. 511, 530 (1985).

On September 30, 2025, the district court entered an Order denying Chief Davis's Motion to Dismiss asserting the defense of qualified immunity, ruling that Plaintiff-Appellee had "plausibly alleged a violation of clearly established rights." (Order, R. 484, PageID 7065.) The qualified immunity issue in this appeal turns on a purely legal question of whether the facts as alleged would allow a jury to find Chief Davis had violated a clearly established constitutional right. *See, e.g.*, *Sutton v. Metro. Gov't of Nashville & Davidson Cty.*, 700 F.3d 865, 871 (6th Cir. 2012) ("[T]he rejection of a qualified-immunity claim is reviewable on interlocutory appeal only to the extent that it raises a question of law . . . . We will therefore limit our review to the purely legal question of whether the facts as alleged by Sutton would allow a jury to find a violation of a clearly established constitutional right.") (internal citation omitted).

On October 29, 2025, Chief Davis timely filed her Notice of Appeal. (Notice of Appeal, R. 507.)

**STATEMENT OF THE ISSUES PRESENTED FOR REVIEW**

1.  Whether the district court erred in denying Chief Davis's Motion to Dismiss on qualified immunity grounds in finding that Plaintiff-Appellee had plausibly alleged a violation of a clearly established constitutional right.

**INTRODUCTION**

The question in this appeal is whether Defendant-Appellant Chief Cerelyn Davis can be held liable for the death of Tyre Nichols based on the allegations in the First Amended Complaint.

The answer is no. Chief Davis is entitled to qualified immunity, and this Court should reverse the district court's denial of Chief Davis's Motion to Dismiss.

**STATEMENT OF THE CASE**

### A. Plaintiff-Appellee's Allegations Regarding the Incident Giving Rise to the Lawsuit

Plaintiff-Appellee RowVaughn Wells, individually and as Administratrix Ad Litem of the Estate of Tyre Deandre Nichols, deceased ("Plaintiff-Appellee"), filed the subject lawsuit on April 19, 2023, alleging various constitutional violations and state law tort claims against the City of Memphis ("the City"), three paramedics, and several members of the Memphis Police Department ("MPD"), including Defendant-Appellant Chief Davis, the Chief of Police of MPD. (Compl., R. 1, PageID 1–139.) The lawsuit arose from the death of Tyre Deandre Nichols ("Mr. Nichols") following his interaction with five MPD officers on January 7, 2023. (*Id.* at PageID 12–13.)

Plaintiff-Appellee states that on the evening of January 7, 2023, Mr. Nichols left Shelby Farms Park to return to his home. (Am. Compl., R. 277, PageID 3162.) At the same time, Plaintiff-Appellee alleges that former MPD officers, Defendants

Emmitt Martin, III, Demetrius Haley, and Preston Hemphill, who were all members of MPD's SCORPION Unit, were on patrol in unmarked cars. (*Id.*) According to Plaintiff-Appellee, around 8:20 p.m., the Officers spotted Mr. Nichols driving and called MPD Dispatch to run his license plate number. (*Id.*) MPD Dispatch reported that there were no outstanding warrants. (*Id.*) Even so, Officers Martin, Haley, and Hemphill allegedly boxed in Mr. Nichols with their patrol cars as he attempted to make a left turn. (*Id.* at PageID 3163.)

Plaintiff-Appellee alleges that, without any type of reasonable suspicion or probable cause, Officers Martin and Haley then opened Mr. Nichols's car door and forcefully pulled him out of the car while pushing him down, assaulting him, and shouting at him. (*Id.* at PageID 3163–64.)

Plaintiff-Appellee alleges that these officers were charged with carrying out Chief Davis's directive "to make [traffic] stops, even without a Constitutional basis for doing so." (*Id.* at PageID 3162.) Plaintiff-Appellee further alleges that Chief Davis made a vehicle seizure policy a department wide initiative and notified the public of it. (*Id.* at PageID 3143.)

Plaintiff-Appellee alleges that "[i]n accordance with Chief Davis's directives to stop and seize cars even without a constitutional basis, Officer Martin, Officer Haley, and Officer Hemphill set out to stop [Mr. Nichols]." (*Id.* at PageID 3162.)

Plaintiff-Appellee alleges that "Officer Martin and Officer Haley knew that Chief Davis's directive was to make stops and suppress crime even without a Constitutional basis—and further knew that MPD failed to review or audit officers' body-worn camera usage—so neither Officer Martin nor Officer Haley activated their cameras when they stopped [Mr. Nichols], knowing they could fabricate a reasonable basis for their actions after the fact and not face any repercussions." (*Id.* at PageID 3164.)

Plaintiff-Appellee asserts that Officer Hemphill then sprinted out of his car with his gun drawn, escalating the situation further. (*Id.*) Plaintiff-Appellee asserts that "[a]ll three SCORPION Officers (Officer Martin, Officer Haley, and Officer Hemphill) simultaneously restrained, pulled, and struck [Mr. Nichols] trying to force him further into the ground, and yanked his arms behind his back, all in keeping with MPD's custom of brutalizing civilians without justification." (*Id.* at PageID 3166.) Plaintiff-Appellee alleges that Officer Haley then sprayed pepper spray in Mr. Nichols's face at close range. (*Id.* at PageID 3167.) Mr. Nichols freed himself, and he fled from the officers on foot. (*Id.*)

Plaintiff-Appellee claims that Officer Hemphill deployed his taser as Mr. Nichols ran from the officers, and the other officers began a foot chase. (*Id.*) Plaintiff-Appellee alleges that Mr. Nichols "reached the intersection of Bear Creek Cove and Castlegate Road . . . when he was captured by SCORPION Officers

Justin Smith and Tadarrius Bean at approximately 8:30 p.m., who were joined by Officer Desmond Mills seconds later." (*Id.* at PageID 3168.)

Plaintiff-Appellee claims that Officers Martin, Haley, Smith, Mills, Jr., and Bean "beat [Mr. Nichols] within an inch of his life over the course of seven unrelenting minutes without any justifiable reason and without any government interest in doing so." (*Id.* at PageID 3171.)

Plaintiff-Appellee claims that more officers arrived on the scene but expressed no concern for Mr. Nichols. (*Id.* at PageID 3174.) Plaintiff-Appellee alleges that Defendant Lt. DeWayne Smith, who was a supervisor of the SCORPION Unit, arrived late to the scene. (*Id.* at PageID 3180.) Once there, Plaintiff-Appellee alleges that Lt. Smith saw Mr. Nichols's condition but did not question the officers about his condition. (*Id.* at PageID 3181.) Plaintiff-Appellee claims that Lt. Smith allegedly told Plaintiff-Appellee that Mr. Nichols was under arrest for driving under the influence. (*Id.* at PageID 3182.) Plaintiff-Appellee claims that Lt. Smith misled and lied to Plaintiff-Appellee. (*Id.*)

Plaintiff-Appellee alleges that around 8:41 p.m., three Memphis Fire Department EMTs, Robert Long, JaMichael Sandridge, and Lieutenant Michelle Whitaker, arrived on the scene but failed to render necessary aid to Mr. Nichols. (*Id.* at PageID 3177–79.)

Shortly thereafter, Mr. Nichols was transported to the hospital where he passed away three days later. (*Id.* at PageID 3180, 3185.) Plaintiff-Appellee alleges that SCORPION Officers and Lt. Smith tried to cover up their crimes after the incident. (*Id.* at PageID 3183–85.)

**B.      Plaintiff-Appellee's Allegations Regarding an Alleged "Run Tax" and "Code of Silence" Within MPD.**

Plaintiff-Appellee alleges that MPD had a longstanding custom of brutalizing citizens without justification. (*Id.* at PageID 3137.) More specifically, Plaintiff-Appellee contends that MPD had a widespread custom in which officers used force against citizens because the person annoyed, angered, or embarrassed the MPD officer in some way. (*Id.*) Plaintiff-Appellee alleges that this practice is often referred to as a "tax" or a "run tax" on citizens. (*Id.*) Plaintiff-Appellee claims that the "run tax" "generally meant beating a resident once they were already restrained or in police custody." (*Id.*) Plaintiff-Appellee alleges that this "run tax" was not limited to the SCORPION Unit, which is the unit in which the MPD officers who encountered Mr. Nichols worked. (*Id.*)

Plaintiff-Appellee alleges that this "run tax" was enabled by a "code of silence within the MPD in which officers lie for each other, manipulate evidence, and refuse to intervene or report wrongdoing, all to cover up violations of MPD policy, including unlawful use of force." (*Id.* at PageID 3138.) Plaintiff-Appellee claims that "[w]hen MPD officers used excessive force against a civilian, officers

15

frequently would exaggerate or make up what the person did, fabricating violent or threatening behavior or ongoing noncompliance that falsely made the officers' excessive force appear proportional and necessary." (*Id.*) Plaintiff-Appellee alleges that "[t]he code of silence meant that MPD officers would fail to report violations by other officers and would assist other officers in covering up violations." (*Id.* at PageID 3139.) Plaintiff-Appellee also contends that the code of silence was enabled by inadequate supervision and oversight. (*Id.*) Plaintiff-Appellee claims that MPD supervisors discouraged patrol officers from reporting excessive uses of force, or the supervisors would fail to investigate improper uses of force, effectively turning a blind eye to policy violations. (*Id.*)

### C. Plaintiff-Appellee's Allegations Regarding Chief Davis and MPD's SCORPION Unit.

In April 2021, the City appointed Defendant-Appellant Chief Davis as Chief of Police of MPD. (*Id.* at PageID 3133.) Plaintiff-Appellee alleges that within days of starting her job, she commented that MPD was "woefully unsupervised." (*Id.* at PageID 3140.)

Importantly, Plaintiff-Appellee quoted portions of an interview Chief Davis gave to a news agency *after the incident* giving rise to the lawsuit. Moreover, the

interview from which the statement was taken is not shown in its entirety by the news agency in its reporting, and it is edited to omit much of the interview.[1]

What Chief Davis actually said in the portions of the edited interview is as follows:

> "The whole idea was to have more visibility, be laser focused on repeat offenders, those individuals that we know are committing violent crimes in the community…."

> "Everything about traffic stops, they have all kinds of de-escalation training. We take them off the streets every eight months so that they can have a decompression moment, you know. Have an opportunity to do something, retrain…."

> "You can have all of the ideal policies but if you have a culture that doesn't have supervision, that doesn't have adherence to the policies, then you've got problems[]" . . . .

> "You can never do enough leadership training, not just at the top level but also at the mid manage level…."

> "People may question my leadership, but you know, I would like to say that, you know I have stood and have done the work as it relates to how to manage an organization, what's important to the organization. The changes that I've made here…"

> "I've also asked the city to give me 125 Sergeant positions, those field level supervisors, because our department is woefully unsupervised. That's one of the issues that I noticed when I first came here."

---

[1] Chief Davis raised this issue with the District Court in her Reply in Support of Motion to Dismiss. (Reply, R. 382, PageID 5608–09.)

> "I have told them, in person, when you commit a crime in my
> police department you don't get to wear the badge, you don't get
> to wear the uniform[]" . . . .

Marcus Hunter, *Chief Davis discusses disbanding SCORPION unit*, WREG

MEMPHIS (Jan. 29, 2023) (emphases added), https://wreg.com/news/local/tyre-

nichols/chief-davis-discusses-disbanding-scorpion-unit/ [hereinafter WREG

Interview].[2]

Prior to the City appointing Chief Davis, Plaintiff-Appellee alleges that

MPD had for decades deployed "proactive" policing units in the city under various

---

[2] The Court may consider the entire WREG Interview when ruling on the Motion to Dismiss without converting it to a motion for summary judgment. "When a court is presented with a Rule 12(b)(6) motion, it may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). Though the First Amended Complaint doesn't formally attribute these quotes to the WREG Interview, the quotes in Paragraphs 70 and 71 of the First Amended Complaint make the source clearly identifiable. Consequently, consideration of the full contents of the WREG Interview is proper at the motion to dismiss stage because Plaintiff incorporated it into the pleadings by reference through the quotes included in Paragraphs 70 and 71. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 569 n.13 (2007) (citing Fed. R. Civ. P. 201) ("This was only part of what [the CEO] reportedly said, however, and the District Court was entitled to take notice of the full contents of the published articles referenced in the complaint, from which the truncated quotations were drawn."); *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 469 (6th Cir. 2014) (admitting documents into the record for appeal through judicial notice after the defendant "note[d] that the Complaint references or quotes excerpts from these documents and ask[ed] [the court] to consider those quotations in their full context").

names, including SCORPION.[3] (Am. Compl., R. 277, PageID 3141.) Plaintiff-Appellee alleges that SCORPION was an "elite" tactical unit that provided unit officers with more leeway and less oversight than regular MPD patrol officers. (*Id.*)

Plaintiff-Appellee alleges that the SCORPION Unit pursued similar tactics as a former unit of the Atlanta Police Department known as "RED DOG," of which Chief Davis was a member when she was employed by the Atlanta Police Department. (*Id.* at PageID 3142.) Plaintiff-Appellee claims that the "stated purpose of these units was to enter purportedly 'high crime' areas and interdict hardened criminals there." (*Id.*) Plaintiff-Appellee claims that units like the SCORPION Unit engaged in pretextual stops for minor infractions "to harass and intimidate residents," resulting in "higher numbers of stops, arrests, and vehicle seizures" and projecting the appearance that "City policymakers were winning their war on crime." (*Id.*) According to Plaintiff-Appellee, these pretextual stops resulted in "unjustified violent encounters with community members, including high-speed chases and physical force that violated both MPD's policies and the constitutional rights of Memphis civilians." (*Id.*)

---

[3] SCORPION stands for the Street Crimes Operation to Restore Peace in Our Neighborhoods. (Memorandum of Law in Support of City Defendants' Motion to Dismiss, R. 303-1, Page ID 4257–58.)

Plaintiff-Appellee claims that excessive force was exacerbated by top-down pressure within MPD, and specialized unit commanders, such as SCORPION Unit commanders, who were required to set clear operational goals and measurable performance objectives. (*Id.*) Plaintiff-Appellee asserts that to meet the SCORPION Unit's performance objectives, officers were given informal permission to engage in car chases that were unauthorized by formal MPD policy, and that these unauthorized car chases "played out in dangerous ways." (*Id.* at PageID 3143.)

### D. Plaintiff-Appellee's Allegations Against Chief Davis, Individually.

Plaintiff-Appellee alleges that Chief Davis has supervisory authority for the City regarding "policing and police policies and practices." (*Id.* at PageID 3187.) Plaintiff-Appellee alleges that the misconduct set forth in the First Amended Complaint was undertaken pursuant to City policies and practices of (1) "encourag[ing] the very type of misconduct at issue here by failing adequately to train, supervise, control, and discipline its officers such that its failures manifest deliberate indifference;" (2) "facilitat[ing] the very type of misconduct at issue here by failing adequately to investigate, punish, and discipline prior instances of similar misconduct, thereby leading [MPD] police officers to believe their actions are unlikely ever to be meaningfully scrutinized and, in that way, directly encourag[ed] future uses of excessive deadly force such as those [Plaintiff-

Appellee] complains of;" and (3) "[a]s a matter of widespread practice, officers of the [MPD] abused civilians, including through [MPD's] encouragement of unsupervised excessive uses of force by 'proactive' policing units like SCORPION, and then officers and supervisors covered it up in a manner similar to that alleged by [Plaintiff-Appellee]." (*Id.* at PageID 3188.)

Plaintiff-Appellee alleges that "Chief Davis 'knew about these failures of MPD policy and practice but was indifferent to them, thereby encouraging them and allowing them to flourish.'" (*Id.*) Further, Plaintiff-Appellee alleges that "[a]s a direct and proximate result of Chief Davis's failure to supervise as described in this [First Amended] Complaint," Mr. Nichols suffered damages. (*Id.* at PageID 3189.) Plaintiff-Appellee requested that the district court award compensatory and special damages in an amount to be determined by a jury and requested that punitive damages be awarded against Chief Davis. (*Id.*)

### E.    The Proceedings in the District Court.

Chief Davis, in her individual capacity, filed a Motion to Dismiss for failure to state a claim under Fed. R. Civ P. 12(b)(6). (City Defendants' Motion to Dismiss, R. 303, PageID 4253–54.)[4] Chief Davis asserted that she is entitled to qualified immunity on Plaintiff-Appellee's Fourth Amendment claim against her.

---

[4] Chief Davis filed a combined Motion to Dismiss with co-defendants City of Memphis and Lt. DeWayne Smith as an Agent of the City, known collectively as "the "City Defendants." (R. 303, PageID 4253.)

(Mem. of L. in Support of the City Defs.' Mot. to Dismiss, R. 303-1, PageID 4263–66.) Specifically, Chief Davis argued that: (1) Plaintiff-Appellee had not alleged that she violated any statutory or constitutional right; and (2) there was no clearly established law under which Chief Davis should have known her actions, if true, were unlawful. (*Id.* at PageID 4264–65.)

Plaintiff-Appellee countered that: (1) the First Amended Complaint had sufficiently alleged a supervisory liability claim against Chief Davis; and (2) the acts and omissions alleged against Chief Davis have long been established as unlawful. (Pl.'s Omnibus Resp. to Defs.' Mot. to Dismiss, R. 347, PageID 4759–63.)

The district court found that Plaintiff-Appellee plausibly alleged that Chief Davis violated constitutional rights in her supervisory role as MPD Chief of Police. (Order Granting in Part and Denying in Part the City Defendants' Mots. to Dismiss, R. 484, PageID 7065.) The district court further found that "it was clearly established at the time of these events that a police supervisor could be liable for 'at least implicitly authoriz[ing], approv[ing], or knowingly acquiesc[ing] in the unconstitutional conduct of the offending officers.'" (*Id.* at PageID 7064 (citing *Peatross v. City of Memphis*, 818 F.3d 233, 242 (6th Cir. 2016).)

**SUMMARY OF THE ARGUMENT**

Chief Davis is entitled to qualified immunity because Plaintiff-Appellee has not plausibly alleged that Chief Davis committed a constitutional violation through her actions or inaction. It is well-settled that under Section 1983, supervisory liability cannot rest on *respondeat superior*—a plaintiff must allege that the supervisor engaged in "***active unconstitutional behavior***," and the plaintiff ***must establish a causal connection*** between that conduct and the injury. Mere failure to act or general supervisory authority is insufficient to plausibly state a claim.

Qualified immunity shields officials who are performing discretionary functions unless they violate clearly established rights. To overcome this defense, a plaintiff must plead both a constitutional violation and that the right was clearly established. "Clearly established" means that, at the time of Chief Davis's alleged conduct, the law must have been "sufficiently clear" that every "reasonable official" would understand that what she was doing was unlawful. Plaintiff-Appellee fails on both prongs—Plaintiff-Appellee failed to plausibly plead that Chief Davis violated Mr. Nichols' clearly established rights through her actions or inaction as a supervisor of the Memphis Police Department, and Plaintiff-Appellee failed to plead that at the time of Chief Davis's alleged conduct, the law was sufficiently clear that she should have been on notice that what she was doing was unlawful.

Plaintiff-Appellee's allegations Chief Davis boil down to two simple claims: (1) that Chief Davis oversaw—and was deliberately indifferent to—a department that lacked adequate supervision; and (2) that Chief Davis promoted aggressive traffic enforcement through proactive policing.

These allegations do not show "active unconstitutional conduct" on the part of Chief Davis, nor do they show that Chief Davis authorized, approved, or knowingly acquiesced in unconstitutional conduct; nor do Plaintiff-Appellee's allegations establish a causal link between Chief Davis's alleged conduct and Mr. Nichols's injuries. Moreover, Plaintiff-Appellee failed to plead that the unlawfulness of Chief Davis's alleged conduct was clearly established at the time.

Further, the district court's reliance on *Peatross v. City of Memphis* was misplaced. Unlike the detailed allegations of deliberate indifference and cover-up in *Peatross*, here Plaintiff-Appellee alleges that Chief Davis knew of insufficient supervision but did nothing to address it. It is clear, however, from the record that Chief Davis was not deliberately indifferent to the issues she saw within MPD when she took over, and that she acted to correct those deficiencies by requesting an additional 125 field supervisors before the incident giving rise to the lawsuit.

Chief Davis is entitled to qualified immunity, and the district court erred in denying her Motion to Dismiss.

**STANDARD OF REVIEW**

The Court reviews *de novo* an order denying a motion to dismiss based on qualified immunity. *Sutton v. Metro. Gov't of Nashville & Davidson Cty.*, 700 F.3d 865, 871 (6th Cir. 2012). When a denial of a motion to dismiss based on qualified immunity is brought before the Court on an interlocutory appeal, the Court's review is limited to the "purely legal question" of "whether the facts as alleged by [the plaintiff] would allow a jury to find a violation of a clearly established constitutional right." *Id.* (internal citations omitted).

Under Federal Rule of Civil Procedure 12(b)(6), the Court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Royal Truck & Trailer Sales and Serv., Inc. v. Kraft*, 974 F.3d 756, 758 (6th Cir. 2020) (quotations and citation omitted).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556

U.S. at 679.

Federal Rule of Civil Procedure 8 "demands more than an unadorned, the defendant-unlawfully-harmed me accusation." *Iqbal*, 556 U.S. at 678. While a complaint need not present detailed factual allegations to be cognizable, it must provide more than "labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." *Twombly*, 550 U.S. at 545. The factual allegations in the complaint "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (citing authorities). In other words, "claims set forth in a complaint must be plausible, rather than conceivable." *Id.* at 570. A complaint must have a factual foundation, and the mere possibility "that a plaintiff might later establish some set of undisclosed facts to support recovery" is insufficient to survive a 12(b)(6) challenge. *Id.* at 561 (internal quotation marks omitted). If the plaintiff does not "nudge his claims across the line from conceivable to plausible, his complaint must be dismissed." *Id.*

The *Twombly* plausibility standard consists of a "two-pronged approach." *Iqbal*, 556 U.S. at 679. Under the first prong, the Court must identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* The second prong requires that "when there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.*

"Although a [motion to dismiss] pursuant to Rule 12(b)(6) invites an inquiry into the legal sufficiency of the complaint, not an analysis of potential defenses to the claims set forth therein, dismissal nevertheless is appropriate when the defendant is entitled to a meritorious affirmative defense such as qualified immunity." *Venema v. West*, 133 F.4th 625, 632 (6th Cir. 2025) (quoting *Peatross v. City of Memphis*, 818 F.3d 233, 241 (6th Cir. 2016)).

# ARGUMENT

## Chief Davis is Entitled to Qualified Immunity on Plaintiff-Appellee's Fourth Amendment Claim Because Plaintiff-Appellee Failed to Plausibly Plead that Chief Davis Committed a Constitutional Violation.

Chief Davis, in her individual capacity, is protected by the doctrine of qualified immunity as Chief of Police of MPD. As a general rule, "government officials are entitled to some form of immunity from suits for damages." *Crawford v. Tilley*, 15 F.4th 752, 760 (6th Cir. 2021) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 807 (1982)). Qualified immunity is given to government officials who perform "discretionary functions," serving as protection from civil liability provided "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* (quoting *Harlow*, 457 U.S. at 818). The plaintiff bears the burden of overcoming a qualified immunity defense. *Id.* Qualified immunity serves to balance "'the need to hold public officials accountable when they exercise power responsibly' with 'the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.'" *Id.* (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)); *see Peatross*, 818 F.3d at 240 (quoting *Pearson*, 555 U.S. at 231). An assertion of qualified immunity protection "may be apparent from the face of the complaint, rendering a motion to dismiss appropriate." *Crawford*, 15 F.4th at 763.

To defeat qualified immunity, a plaintiff must state a claim that (1) the government official violated a federal statutory or constitutional right, and (2) the unlawfulness of the official's conduct was clearly established at the time of the alleged violation. *Id.* at 760 (citing *D.C. v. Wesby*, 583 U.S. 48, 62–63 (2018)). Courts can address these prongs in either order, but in the end, a plaintiff must meet the requirements of both prongs to overcome the immunity defense. *Id.* If a plaintiff fails to adequately plead either prong, the claim fails on its face, and the official is entitled to qualified immunity. *Id.*

The Sixth Circuit clarified that a plaintiff must clear "three hurdles" in order to plausibly plead the first prong of qualified immunity, also known as the "constitutional violation prong":

> First, [the plaintiff] must allege that someone [the supervisor] oversees violated [the plaintiff's] constitutional rights. Second, [the plaintiff] must allege "active unconstitutional behavior" by [the supervisor]. And third, [the plaintiff] must allege that the "active unconstitutional behavior" was both a cause in fact and a proximate cause of the violation of [the plaintiff's] rights.

*Id.* at 766.

In this case, Plaintiff-Appellee failed to clear the second and third hurdles to plausibly plead the first prong to defeat qualified immunity. Chief Davis's assertion of qualified immunity cannot be overcome by Plaintiff-Appellee's allegations. Therefore, the district court erred when it denied Chief Davis's motion to dismiss on qualified immunity grounds.

**I.    Plaintiff-Appellee Failed to Allege Any *Active* Unconstitutional Conduct by Chief Davis Regarding Mr. Nichols.**

It is fundamental that a person sued in her individual capacity under Section 1983 can be held liable only for her own unconstitutional behavior. *Heyerman v. Cty. of Calhoun*, 680 F.3d 642, 647 (6th Cir. 2012). A thorough review of the First Amended Complaint reveals that Plaintiff-Appellee failed to include ***any*** allegations that ***Chief Davis herself*** took ***any action*** that violated Mr. Nichols's constitutional rights. For example, Paragraph 290 of the First Amended Complaint states "the conduct of multiple MPD officers toward [Mr. Nichols] on the night of January 7, 2023 constituted both an unreasonable seizure and excessive force in violation of the Fourth Amendment to the United States Constitution." (Am. Compl., R. 277, PageID 3188.) Paragraph 290 does not—nor does any other paragraph in the Amended Complaint—allege any unconstitutional action personally taken by Chief Davis toward Mr. Nichols on January 7, 2023. (*See generally* Am. Compl., R. 277.)

Moreover, it is well-settled that section 1983 liability "cannot be premised solely on a theory of respondent superior, or the right to control employees." *Id.* (citation omitted). Plaintiff-Appellee "must point to a specific action of [the] individual supervisor to defeat a qualified immunity claim." *Phillips v. Roane Cty.*, 534 F.3d 531, 544 (6th Cir. 2008).

Therefore, to defeat Chief Davis's qualified immunity defense, Plaintiff-Appellee must plausibly allege that Chief Davis "authorized, approved, or knowingly acquiesced in the unconstitutional conduct . . . of [her] subordinate[s] through the execution of [her] job functions." *Does v. Whitmer*, 69 F.4th 300, 306 (6th Cir. 2023) (citing *Crawford*, 15 F.4th at 761).

Here, Plaintiff-Appellee has not plausibly pled any "active conduct" of Chief Davis that amounts to a constitutional violation for her alleged "failure to supervise" the MPD officers under her command. (Am. Compl., R. 277, PageID 3187.) The First Amended Complaint alleges that Chief Davis knew about certain failures of MPD policy and practice that led to the misconduct committed by the officers who interacted with Mr. Nichols on January 7, 2023, "but was indifferent to them, thereby encouraging them and allowing them to flourish." (*Id.*) But indifference is not encouragement.

Plaintiff-Appellee cites those purported MPD policy failures as: (1) "failing adequately to train, supervise, control, and discipline its officers;" (2) "failing adequately to investigate, punish, and discipline prior instances of similar misconduct, thereby leading [MPD] officers to believe their actions are unlikely ever to be meaningfully scrutinized;" and (3) "a widespread practice[] . . . of [MPD] officers abus[ing] civilians, including through [MPD's] encouragement of unsupervised excessive uses of force by 'proactive' policing units like

SCORPION," followed by officers and supervisors covering up the misconduct. (*Id.* at PageID 3188).

These bare assertions, much like the bare allegations in *Twombly,* amount to nothing more than a "formulaic recitation of the elements" of a § 1983 supervisory liability claim, namely that Chief Davis failed to adequately supervise the department. As such, the allegations are conclusory and not entitled to be assumed true. *Iqbal*, 556 U.S. at 681 (citing *Twombly*, 550 U.S. at 554–55).

Plaintiff-Appellee's other allegations against Chief Davis fare no better under *Iqbal's* guidance. To prevail on her theory that the Chief Davis is liable for the death of Mr. Nichols under § 1983, the Complaint must contain facts plausibly showing that she "at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate[s].'" *Crawford*, 15 F. 4th at 761 (quoting *Garza v. Lansing Sch. Dist.*, 972 F.3d 853, 865 (6th Cir. 2020) (citation omitted); *Gregory v. City of Louisville*, 444 F.3d 725, 751 (6th Cir. 2006) ("Plaintiff must show that the supervisors somehow encouraged or condoned the actions of their inferiors."); *Doe v. City of Roseville*, 296 F.3d 431, 440 (6th Cir. 2002) (encouragement satisfies this requirement). This "requires some active unconstitutional behavior on the part of the supervisor." *Id.* (citing *Peatross*, 818 F.3d at 241 (citation and quotation omitted). The First Amended Complaint contains no such plausible allegations. It is simply not plausible that Chief Davis,

through her proactive policing initiatives, "authorized, approved, or knowingly acquiesced in the unconstitutional conduct of her subordinates."

Moreover, it is well-established that "a mere failure to act" is insufficient to establish a claim of supervisory liability. *Crawford*, 15 F.4th at 761 (quoting *Peatross*, 818 F.3d at 241) ("But supervisory liability also has sharp limits. It will not attach for 'a mere failure to act.'"); *see also Whitmer*, 69 F.4th at 306 (citations omitted); *James v. City of Detroit*, No. CV 17-10506, 2017 WL 5158740, at *3 (E.D. Mich. Nov. 7, 2017) (quoting *Essex v. Cty. of Livingston*, 518 Fed. Appx. 351, 355 (6th Cir. 2013)).

In short, Plaintiff-Appellee failed to allege any active conduct on the part of Chief Davis that could plausibly be considered a constitutional violation; and Plaintiff-Appellee's failure-to-act allegations are insufficient to state a claim for relief under Section 1983.

## II. Plaintiff-Appellee Failed to Plead a Causal Link Between Chief Davis's Alleged Conduct and the Injuries Sustained by Mr. Nichols.

Plaintiff-Appellee's allegations utterly fail to plausibly establish a direct and proximate causal link between Chief Davis's conduct and the injuries sustained by Mr. Nichols. For supervisory liability to attach, Plaintiff-Appellee must allege "more than an attenuated connection between the injury and the supervisor's wrongful conduct." *Whitmer*, 69 F.4th at 307 (quoting *Peatross*, 818 F.3d at 241). "Sloppiness, recklessness, or negligence is insufficient to establish [supervisory]

liability." *Id.* (citing *Garza v. Lansing Sch. Dist.*, 972 F.3d 853, 866 (6th Cir. 2020)). That said, "deliberate indifference, knowing acquiescence, tacit or implicit authorization, or failure to take precautions against likely violation may suffice." *Id.* (citing *Garza*, 972 F.3d at 866). Moreover, a supervisor may be held liable under Section 1983 where she "abandon[s] the specific duties of [her] position . . . in the face of actual knowledge of a breakdown in the proper workings of the department." *Winkler v. Madison Cty.*, 893 F.3d 877, 898 (6th Cir. 2018).

Here, Plaintiff-Appellee baldly concludes that the actions taken against Mr. Nichols on January 7, 2023, were "a direct and proximate result of Chief Davis's failure to supervise," as described in the First Amended Complaint. (Am. Compl., R. 277, PageID 3189.) In support of this argument, Plaintiff-Appellee points to a statement made by Chief Davis after the Nichols incident to suggest that Chief Davis was on notice of a lack of supervision but failed to do anything about it. Plaintiff-Appellee alleges that "Chief Davis indicated that within MPD there was 'a culture that doesn't have supervision, that doesn't have adherence to the policies,' which, she indicated, enabled abusive police practices such as the 'run tax' that was visited on [Mr. Nichols]." (*Id.* at PageID 3140, ¶ 71.)

Importantly, Plaintiff-Appellee is quoting (actually, Plaintiff-Appellee *is misquoting*) from an interview given to a news agency ***after the incident*** giving

34

rise to the lawsuit. Moreover, the interview from which the statement was taken is not shown in its entirety and is edited to omit much of the interview.

It is important to consider the entirety of Chief Davis's statement that was excerpted in the Complaint, not just the cherry-picked one-liner that Plaintiff-Appellee uses to support her strained argument that Chief Davis should be liable for Mr. Nichols's injuries. First, Chief Davis pointed out that SCORPION officers are taken off the streets for deescalation and additional training every eight months. *See supra* n. 2; *WREG Interview*, https://wreg.com/news/local/tyre-nichols/chief-davis-discusses-disbanding-scorpion-unit/. Second, Chief Davis does ***not*** state that MPD had a culture of a lack supervision, but rather "if you have a culture that doesn't have supervision, that doesn't have adherence to the policies, then you've got problems[.]" *Id.*

Third, she notes the changes she has made since she took over as Chief of Police in May 2021. *Id.* Fourth, she unequivocally states that if officers commit a crime in her department, they will be punished. *Id.* And most importantly, Chief Davis states that she was aware of the need for additional supervisors when she took the job with MPD, and that ***she acted on it by requesting an additional 125 field level supervisors.*** *Id.*

Thus, Chief Davis's statement, considered in its entirety, actually shows ***the opposite of deliberate indifference***. Chief Davis's statement shows that she

required deescalation and extra training for SCORPION officers; she punished officers who committed crimes; and she started the process to implement an additional 125 field supervisors. Plaintiff-Appellee, therefore, did not plausibly allege that Chief Davis authorized, approved, or knowingly acquiesced in any unconstitutional conduct. *See Whitmer*, 69 F.4th at 307.

Not only did Plaintiff-Appellee fail to establish that Chief Davis directly caused Mr. Nichols's injuries, she also has failed to establish that Chief Davis proximately caused his injuries. The Supreme Court has stated that "§ 1983 'should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions.'" *Malley v. Briggs,* 475 U.S. 335, 345 (1986) (quoting *Monroe v. Pape,* 365 U.S. 167, 187 (1961)). "Relying on this language, courts have framed the § 1983 proximate-cause question as a matter of foreseeability, asking whether it was reasonably foreseeable that the complained of harm would befall the § 1983 plaintiff as a result of the defendant's conduct. Even if an intervening third party is the immediate trigger for the plaintiff's injury, the defendant may still be proximately liable, provided that the third party's actions were foreseeable." *Powers v. Hamilton Cty. Pub. Def. Comm'n*, 501 F.3d 592, 609 (6th Cir. 2007)

Additionally, Plaintiff-Appellee cannot sustain a supervisory liability claim based on Chief Davis's alleged encouragement of MPD officers to act through

proactive policing. Notwithstanding the fact that pretextual traffic stops are constitutional, *see Whren v. United States*, 517 U.S. 806, 813 (1996), Plaintiff-Appellee attempts to connect Chief Davis's alleged encouragement of MPD officers to aggressively enforce traffic laws through traffic stops, even if pretextual, to Mr. Nichols's injuries. (*See* Am. Compl., R. 277, PageID 3144, 3162.) But this is insufficient to plausibly state a claim of supervisory liability against Chief Davis because Mr. Nichols's injuries were not a foreseeable result from Chief Davis's elected course of action.

For supervisory liability to attach to Chief Davis, it would have to be reasonably foreseeable to her that by promoting proactive policing, that officers who stopped a citizen for a purported—yet constitutional—pretextual traffic violation, that such an encounter would result in the citizen resisting arrest, then fleeing the officers, then resisting the efforts made by the officers to arrest the citizen, and ultimately resulting in excessive force being used against that citizen. This tenuous chain of events simply does not demonstrate a "direct relation between the injury asserted and the injurious conduct alleged" necessary to sufficiently link Chief Davis's conduct to Mr. Nichols's injuries. *See, e.g., Crosby v. Twitter, Inc.*, 921 F.3d 617, 623 (6th Cir. 2019) ("Instead, proximate cause prevents liability where there is not a sufficient link between the defendant's

conduct and the plaintiff's injuries. So proximate cause requires us to draw a line somewhere in the sand—refusing to extend liability beyond a certain point.").

Here, the Court should draw a line in the sand and refuse to extend liability for Mr. Nichols's injuries to Chief Davis. Plaintiff-Appellee has failed to plead a "causal connection" between Chief Davis's supposed "active unconstitutional behavior" and Mr. Nichols's injuries such that she is liable for supervisory liability.

### III. Sixth Circuit Precedent Demonstrates the Insufficiency of Plaintiff's Allegations Regarding Chief Davis.

Multiple recent Sixth Circuit cases demonstrate how Plaintiff-Appellee's allegations of supervisory failings do not plausibly plead a constitutional violation committed by Chief Davis that defeats the qualified immunity to which she is entitled. In *Crawford v. Tilley*, Kentucky police arrested a man and took him to the Madison County Detention Center ("MCDC"). *Crawford*, 15 F.4th at 756–57. The arrestee's wife told the arresting officers that her husband had lung cancer and would need immediate medical attention while in custody. *Id.* at 757. While in custody, MCDC medical staff removed the arrestee's pain-medication patch, failed to provide him with his prescription medications, refused to honor his scheduled chemotherapy appointments, and failed to treat him on occasions where he was vomiting blood. *Id.* The arrestee was eventually transferred to the Kentucky State Reformatory ("KSR"), where KSR medical staff withheld his prescription

medication, breathing treatments, and chemotherapy despite his complaints of pain. *Id.* The arrestee died in custody less than a month after his arrest, and an autopsy revealed that he drowned with over three liters of fluid accumulating in his lungs that would have been discovered had staff administered his breathing treatments. *Id.*

The arrestee's wife brought a supervisory liability claim against the Acting Commissioner of the Kentucky Department of Corrections, who oversaw twenty-seven subdivisions and the wardens who managed individual prisons. *Id.* at 757–58. The plaintiff alleged that the Acting Commissioner "accepted" the arrestee's transfer into KSR and "would have been made aware of [the arrestee's] medical conditions" at that time. *Id.* at 758. The plaintiff alleged that the Acting Commissioner was specifically aware that the contractor who provided KSR's medical staff had a pattern of failing to provide inmates with adequate medical care but did nothing in response. *Id.* at 758. Furthermore, the plaintiff attributed the Acting Commissioner's knowledge to ongoing litigation involving prisoners and the estates of deceased prisoners, "critical investigations," and "the obviousness of the problem." *Id.* The Acting Commissioner moved to dismiss the complaint on qualified immunity grounds, which the district court denied. *Id.* at 756.

On appeal, this Court found that the plaintiff had failed to allege any "active unconstitutional behavior" by the Acting Commissioner that proximately caused

her husband's injuries. *Id.* at 766. The Court found that the allegations that the Acting Commissioner knew about KSR's medical contractor's deficient practices to be conclusory based upon the cited sources. *Id.* Additionally, the Court found the complaint to be devoid of any allegation that the Acting Commissioner regularly visited the prisons under his supervision or received briefing about them, which would include briefing about the alleged deficient medical practices. *See id.* at 767. As such, the Court noted there were insufficient allegations to attribute knowledge "so high up the chain of command with so little in the way of alleged exposure to those same conditions." *Id*. Furthermore, the Court found there was insufficient factual information in the complaint to show that the Acting Commissioner knew about the ongoing lawsuits against the contractor, be it through attending meetings or reviewing performance reports. *Id.* Ultimately, the Court determined that the Acting Commissioner's mere acceptance of the arrestee's transfer into KSR did not constitute a sufficient pleading of a constitutional violation committed by the Acting Commissioner that proximately caused the arrestee's death and reversed the district court's denial of qualified immunity. *Id.*

Like the claims in *Crawford*, Plaintiff-Appellee's supervisory liability allegations against Chief Davis lack the required detail needed to plausibly allege a constitutional violation. Like with the Acting Commissioner in *Crawford*, Plaintiff-

Appellee makes no allegations that Chief Davis was regularly briefed on any alleged misconduct being committed by the SCORPION Unit or regularly observed the SCORPION Unit's activities such that she should have been aware of any such misconduct during her tenure as Chief. Plaintiff-Appellee attempts to makes the tenuous connection that Chief Davis was part of a similar unit that employed vaguely described "similar tactics" while she worked at a ***different*** police department. (Am. Compl., R. 277, PageID 3142.) Like the allegations regarding lawsuits made against the Acting Commissioner in *Crawford*, Plaintiff-Appellee has not pled that Chief Davis knew about the specific prior instances of citizen abuse pled in the First Amended Complaint, be them before her command of MPD began or thereafter. (*Id.* at PageID 3144–61.)

Furthermore, like the allegation that the Acting Commissioner in *Crawford* accepted the arrestee-decedent into one of the prisons he oversaw, the mere fact that the SCORPION Unit is among the groups that fall under Chief Davis's command as the head of MPD is far too attenuated to show that any action or inaction by Chief Davis proximately caused Mr. Nichols's tragic death. *See Crawford*, 15 F.4th at 767 (citing *Iqbal*, 556 U.S. at 679). Chief Davis's general oversight cannot constitute supervisory liability. Chief Davis's alleged conduct falls well short of the level required to overcome the protection of qualified immunity.

Similarly instructive is *Spencer v. Jordan*, in which an inmate alleged that prison guards beat him during an unprovoked attack in 2020 during his incarceration at the Southern Ohio Correctional Facility ("SOCF"). *Spencer*, No. 1:22-cv-557, 2023 WL 11878637, at *1 (S.D. Ohio Aug. 8, 2023). The inmate filed suit against the Director of the Ohio Department Rehabilitation and Corrections in her individual capacity, alleging that the Director had violated his constitutional rights through deliberate indifference to his safety. *Id.* The inmate contended that the Director failed to adequately train and supervise the SOCF guards that beat him. *Id.* Further, he alleged that the Director should have known that the inmate filed a prior lawsuit in 2014 in which he alleged "eerily similar" facts to those alleged in his lawsuit about the 2020 incident. *Id.* The inmate asserted that the 2014 lawsuit revealed a "history of unfettered abuse" against him by SOCF guards about which the Director turned a blind eye. *Id.*

In adopting the magistrate's recommendation to grant the Director's motion to dismiss the complaint based on qualified immunity, the district court reasserted that a plaintiff cannot base a supervisory claim on a supervisor's general control over her subordinates or even mere inadequate supervision. *Id.* at *2. The court found that the inmate had failed to allege that the Director encouraged or participated in the 2020 attack, including any allegation that the Director sought to cover up the incident. *Id.* Additionally, the court found that the inmate's vague

42

"history of unfettered abuse" allegation based solely on the 2014 lawsuit lacked the necessary detail to hold the Director personally liable. *Id.*

Like the allegations in *Spencer*, Plaintiff-Appellee's allegations against Chief Davis fail to rise to the level of a plausibly alleged constitutional violation. Chief Davis cannot be held liable for simply being the head of the department that employed the members involved in the incident with Mr. Nichols, nor is her alleged failure to supervise the unit sufficient to plead a constitutional violation. Plaintiff-Appellee has not alleged that Chief Davis participated in the beating of Mr. Nichols, nor that she encouraged the involved MPD members to do so. (Am. Compl., R. 277, PageID 3162–80). Additionally, there is no allegation whatsoever in the First Amended Complaint that Chief Davis tried to cover up the beating of Mr. Nichols, which might otherwise indicate a tacit endorsement of the misconduct engaged in by the SCORPION Unit. (*Id.* at PageID 3183–85); *Whitmer*, 69 F.4th at 307 (citing *Garza*, 972 F.3d at 866) (noting tacit authorization may suffice for supervisory liability).

In short, Plaintiff-Appellee has failed to plausibly plead that Chief Davis "authorized, approved, or knowingly acquiesced" in the acts of the officers that caused Mr. Nichols's injuries on January 7, 2023. *See Crawford*, 15 F.4th at 761 (quoting *Peatross*, 818 F.3d at 242). Therefore, Chief Davis is entitled to qualified immunity on Plaintiff-Appellee's Fourth Amendment claim against her.

**IV. Plaintiff-Appellee Failed to Plead That the Alleged Unlawfulness of Chief Davis's Conduct Was Clearly Established at the Time of Her Conduct.**

Plaintiff-Appellee further failed to plead that the alleged unlawfulness of Chief Davis's conduct was clearly established at the time of her conduct. It is well-settled that "'clearly established' means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *Wesby*, 583 U.S. at 63 (cleaned up). In other words, existing law must have placed the constitutionality of Chief Davis's conduct "beyond debate." *Id.* "This demanding standard protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

"To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent. The rule must be 'settled law,' which means it is dictated by 'controlling authority' or 'a robust consensus of cases of persuasive authority.'" *Id.* (cleaned up). Moreover, "[i]t is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *Id.* "Otherwise, the rule is not one that 'every reasonable official' would know." *Id.* (quotations omitted).

"The 'clearly established' standard also requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before her. This requires a high 'degree of specificity.'" *Id.* (citation omitted). Courts "must not define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Id.* at 63–64. (citations omitted). "A rule is too general if the unlawfulness of the officer's conduct 'does not follow immediately from the conclusion that [the rule] was firmly established.'" *Id.* at 64 (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)).

Here, the legal principles on which Plaintiff attempts to rely as clearly established rights are too general. By her own admission, Plaintiff asserts that the two clearly established "rules" Chief Davis allegedly violated were (1) failure to train/supervise, and (2) her encouragement of proactive policing through pretextual traffic stops. (Pl. Omnibus Resp. in Opp. to Mot. to Dismiss, R. 347, PageID 4759–60.) "It simply does not follow immediately from the conclusion that it was firmly established that [lack of supervision or use of proactive policing through pretextual traffic stops] violates the Fourth Amendment, or that [Chief Davis's conduct in the particular circumstances she faced] was objectively legally unreasonable." *Anderson*, 483 U.S. at 641.

45

In other words, Plaintiff does not point to any clearly established law that prohibited Chief Davis's conduct in the particular circumstances before her.

Plaintiff-Appellee points to *Peatross* as her basis that the law with respect to supervisory liability of police chiefs was clearly established at the time of Chief Davis's conduct. Plaintiff-Appellee asserted, "As set out above, [*Peatross*] held on no uncertain terms that a police chief in a city like Memphis who 'knowingly acquiesce[s] in widespread unconstitutional conduct by the chief's subordinates, including by 'acts' and 'omissions' in failing to address and take reasonable steps to stop that conduct, violates the law and is liable as a supervisor under Section 1983." (Pl. Omnibus Resp. in Opp. to Mot. to Dismiss, R. 347, PageID 4762–63).

Here, *Peatross* is not "clearly established" law such that every reasonable Police Chief would interpret it to establish the particular rule Plaintiff-Appellee seeks to apply. First, *Peatross* itself applied an incorrect standard to the "clearly established" prong of qualified immunity. In *Peatross*, the Court incorrectly stated that the plaintiff "need only show that the right that [the subordinate officers] violated was clearly established at the time of the violation." *Peatross*, 818 F.3d at 245 (citing *Coley v. Lucas Cty.*, 799 F.3d 530, 539–41 (6th Cir. 2015)). *Peatross* concluded that because the decedent's "Fourth Amendment rights [were] clearly established insofar as the alleged misconduct of [the subordinate officers] are concerned… the right [was] clearly established." *Id.*

46

But the one case on which *Peatross* relies <u>does not</u> hold that the plaintiff "need only show that the right that [the subordinate officers] violated was clearly established at the time of the violation" to succeed on the clearly established prong. In *Coley*, the plaintiff specifically alleged that the supervisor had full knowledge of the assault on the prisoner, and that he lied to federal officials about the incident. *Coley*, 799 F.3d at 542. The Court found those allegations "sufficient to show that Plaintiffs have established a valid claim under § 1983, insofar as they have shown that [the supervisor] 'at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate' when he helped [subordinate officers] to cover up their unconstitutional actions." *Id.*

Thus, *Peatross* did not point to any clearly established law that should have placed the constitutionality of Director Armstrong's alleged conduct "beyond debate." Accordingly, *Peatross* was wrongly decided and should not be considered to be "clearly established law" that was "sufficiently clear" such that Chief Davis should have understood that what she was doing was unlawful.

Even if the Court declines to accept the proposition that *Peatross* incorrectly decided the "clearly established" prong of the qualified immunity analysis, Plaintiff-Appellee still fails to establish the clearly established prong through her reliance on *Peatross*. As explained below, this Court decided numerous cases after *Peatross* that declined to apply *Peatross's* analysis to the facts. *See infra*

Argument, Section V. Thus, it cannot reasonably be argued that *Peatross* is "settled law" or "controlling authority" such that "every reasonable official would interpret it to establish the particular rule the plaintiff-appellee seeks to apply."

The district court, too, erred in its application of the "clearly established" prong. The district court simply stated, "[t]he right to be free from excessive force is clearly established. Furthermore, it was clearly established at the time of these events that a police supervisor could be liable for "at least implicitly authoriz[ing], approv[ing], or knowingly acquiesc[ing] in the unconstitutional conduct of the offending officers." (Order on Mot. to Dismiss, R. 484, PageID 7064 (quoting *Peatross*, 818 F.3d at 242.))

But that analysis is also incorrect. A plaintiff may not rely on abstract allegations of constitutional violations. This Court has explained:

> At the same time, we are cognizant of the Supreme Court's admonition that we not let a plaintiff allege rights at such a high level of abstraction that his claim always survives. "<u>A passably clever plaintiff would always be able to identify an abstract clearly established right that the defendant could be alleged to have violated</u>". According to the Court, it is a "longstanding principle that clearly established law should not be defined at a high level of generality." Otherwise, "[p]laintiffs would be able to convert the rule of qualified immunity ... into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." This is especially true under *Iqbal* and *Twombly*.

*Crawford*, 15 F.4th at 765–66 (emphasis added) (first quoting *Anderson*, 483 U.S. at 640 n.2; and then quoting *White v. Pauly*, 580 U.S. 73, 79 (2017)).

Here, Plaintiff-Appellee failed to plead that at the time of Chief Davis's alleged conduct, the law was "sufficiently clear" that every "reasonable official" would understand that what Chief Davis was allegedly doing—and allegedly not doing—was unlawful. In other words, there was no clearly established standard that prohibited Chief Davis from doing what she was allegedly doing, i.e. aggressively enforcing traffic laws. And Plaintiff-Appellee's conclusions regarding Chief Davis's alleged failure to train and failure to supervise, which should not be taken as true for purposes of ruling on motion to dismiss, *Iqbal*, 556 U.S. at 679, are insufficient to establish that Chief Davis's conduct in that regard was clearly unlawful. Accordingly, Chief Davis is entitled to qualified immunity.

## V. *Peatross v. City of Memphis* **Is Distinguishable from the Instant Case.**

In denying Chief Davis's Motion to Dismiss on qualified immunity grounds, the district court relied heavily upon this Court's decision in *Peatross v. City of Memphis*, 818 F.3d 233 (2016). In *Peatross*, the decedent's estate filed suit alleging various constitutional violations after the decedent was shot and killed by two MPD officers. *Peatross*, 818 F.3d at 238. The estate also sued the Director of MPD, alleging that the Director had "personally condoned, encouraged, approved, or at least implicitly authorized [the officers'] personal conduct." *Id.* Additionally, the estate alleged that the Director personally "failed to properly hire, train, supervise, monitor, and discipline" MPD officers, including the officers involved

49

in the shooting. *Id.* The estate further alleged that the Director showed deliberate indifference to the decedent's rights and consciously disregarded the known and foreseeable consequences of failing to correct MPD deficiencies." *Id.* Moreover, the estate claimed that the Director attempted to "cover-up the unconstitutional conduct of his subordinates by exonerating the officers in an effort to escape liability. *Id.* at 243.

In addition to the allegations set forth above, the estate in *Peatross* pled highly specific allegations that were significant to this Court's analysis of whether the estate had plausibly pled a constitutional violation. First, the estate alleged that there had been fifty-four officer-involved shootings in the four years prior to decedent's shooting, and eighteen officer involved shootings in the year prior. *Id.* In 2012, the year before the decedent's shooting, MPD's Director "acknowledged a dire need to review and improve [MPD's] operations." *Id.* The Director further "noted that the MPD needed to improve its disciplinary process as well as the policies and procedures in line with the best law enforcement practices . . . ." *Id.* No improvements were made, after which the Mayor of Memphis "publicly admonished [the Director] and described the MPD as 'unacceptable' and in need of outside scrutiny to analyze its shortcomings in recruitment, accountability, and training in ethical standards." *Id.*

Importantly, the two officers involved in the shooting of the decedent in *Peatross* had been involved in two separate incidents involving the use of excessive force prior to the killing of Vanterpool. *Peatross*, 818 F.3d at 239. And the allegations in *Peatross* included that the Director "personally failed to properly hire, train, supervise, monitor, and discipline officers of the MPD, including Officers Dunaway and McMillen." *Id.* at 238.

Furthermore, in December 2012, there was a "shooting death of [MPD] Officer Montoya Lang," which "fostered a 'heightened' sense of alert among officers in the Memphis area." *Id.* The complaint noted that no additional training was provided after the shooting death of Officer Lang, and soon after, a number of police-related shootings occurred in Memphis. *Id.* The complaint further alleged a "common theme" in each shooting where officers claimed that the individual pointed a gun at them or had a deadly weapon, but MPD failed to investigate any of the claims. *Id.* This Court found that "the Complaint sufficiently pled a causal connection between [the Director's] acts and omissions and [the decedent's] death." *Id.* at 244–45.

Here, in rejecting Chief Davis's qualified immunity defense, the district court emphasized the purported similarities between the instant case and *Peatross*. The district court found that the allegations made against Chief Davis were similar to those made against the MPD Director in *Peatross* in that both officials "publicly

acknowledged the need for change and failed to follow through with any changes."
(Order Denying Motion to Dismiss, R. 484, PageID 7062–63) (quoting *Peatross*,
818 F.3d at 244 (quotation marks omitted)). To that end, the district court found
that the First Amended Complaint "alleges that Chief Davis (1) knew of the
widespread practice of the use of excessive force—referred to by officers as a 'run
tax' . . . (2) acknowledged within her first week that MPD was 'woefully
unsupervised' . . . and created, supported, and incentivized a unit whose officers
routinely used unconstitutional force . . . ." (*Id.* at PageID 7063) (citing Am.
Compl., R. 277, PageID 3137–39, 3140–61, 3173). The district court further found
that Plaintiff-Appellee had alleged that Chief Davis acted with "similar
indifference—or worse, with endorsement—of unconstitutional policies." (*Id.* at
PageID 7063) (citing Am. Compl., R. 277, at PageID 3128, 3140–44).

As shown above, Plaintiff's allegations do not support that conclusion. Chief
Davis was not deliberately indifferent to the risks of proactive policing. The
opposite is true. Chief Davis's statement, from which Plaintiff-Appellee quoted in
the Complaint, shows that she ***required deescalation*** and ***extra training*** for
SCORPION officers; she ***punished officers*** who committed crimes; and ***she
implemented an additional 125 field supervisors***. *See supra* Argument, Section II.
Unlike in *Peatross* where the plaintiff alleged that the Director did nothing in the
face of eighteen officer involved shootings in the year prior to decedent's death,

here, Plaintiff-Appellee's allegations are nothing more unsupported conclusions that cannot support a claim of supervisory liability under Section 1983. *See Whitmer*, 69 F.4th at 307.

Moreover, many district courts within the Sixth Circuit have rejected *Peatross* as applicable to the facts set forth in the complaints there. For example, in *Franklin v. City of Southfield*, the plaintiff filed suit against the Chief of Police after one of his officers allegedly used excessive force against the plaintiff by tasing him. *Franklin*, No. 16-13140, 2018 WL 11224401, at *2 (E.D. Mich. Mar. 29, 2018). In granting the Chief of Police's motion for judgment on the pleadings the plaintiff's supervisory liability claim, the district court rejected the plaintiff's attempt to analogize *Peatross* to the case at hand:

> Here, there is no allegation that [the Chief of Police] encouraged the specific incident of misconduct or directly participated in it.
>
> Franklin's reliance on *Peatross v. City of Memphis*, 818 F. 3d 233 (6th Cir. 2016), as support for the adequacy of his claim is misplaced. The plaintiff in that case alleged specific facts to support a supervisory liability claim against the police director. The complaint included factual allegations about the number of police shootings in the four years leading up to the incident at issue, the increase in the year before the incident, the supervisor's acknowledgment of a need to review and improve the department, including disciplinary processes, policies and procedures as well as the fact that no action had been taken.

*Franklin*, 2018 WL 11224401, at *2–3.

Similarly, in *Casey v. Sanders*, which involved a fatal police shooting, the decedent's estate brought suit against the Commissioner of the Kentucky State Police, which employed the troopers involved in the shooting. *Casey*, No. 7:17-CV-145-KKC, 2018 WL 3078758, at *1 (E.D. Ky. June 21, 2018). In rejecting the estate's reliance on *Peatross* in response to the Commissioner's assertion of qualified immunity in his motion to dismiss, the district court reasoned:

> The allegations in *Peatross*, however, went one-step further than [*Coley v. Lucas Cty.*, 799 F.3d 530 (2015)], alleging that there had been fifty-four police shootings in the previous five years and that, despite Director Armstrong's acknowledgment of "a dire need to review and improve the police department's operations" and "its disciplinary process" no improvements were made. Compared to *Coley* and *Peatross*, the Complaint in this matter fails to allege that Commissioner Sanders, Deputy Commissioner Payne, and Commander Stapleton did anything "more than ***play a passive role*** in the alleged violation or show mere tacit approval of the goings on."

*Casey*, 2018 WL 3078758, at *6–7 (emphasis added); *see also James*, 2017 WL 5158740, at *4 ("Contrary to Plaintiff's position, the plaintiff in *Peatross* alleged specific facts to support a supervisory liability claim against the police director.").

As the Court in *Peatross* noted, "[w]e have long held that supervisory liability requires some 'active unconstitutional behavior' on the part of the supervisor." *Peatross*, 818 F.3d at 242 (citing *Hays v. Jefferson Cty*, 668 F.2d 869, 873–74 (6th Cir. 1982) ("A mere failure to act (even) in the face of a statistical pattern of incidents of misconduct is not sufficient to confer liability" (quotation

marks omitted)). "[A] supervisory official's failure to supervise, control or train the offending individual is not actionable unless the supervisor either encouraged the specific incident of misconduct or in some other way directly participated in it." *Peatross*, 818 F.3d at 242; *see also Lucas v. Chalk*, No. 118CV01211JDBCGC, 2021 WL 794436, at \*7 (W.D. Tenn. Mar. 2, 2021) ("For these Defendants to be individually liable, Plaintiff needed to demonstrate that they "encouraged the ***specific incident*** of misconduct or in some other way directly participated in it.") (citing *Peatross*, 818 F.3d at 242) (emphasis added).

Plaintiff-Appellee's allegations against Chief Davis do not approach the depth of the allegations in *Peatross*. It cannot reasonably be argued that Chief Davis encouraged the specific incident of misconduct at issue here.

Moreover, there is a glaring difference between the allegations against the Director in *Peatross* and Plaintiff-Appellee's allegations against Chief Davis here. In *Peatross*, the estate alleged that the MPD Director "acknowledged a dire need to review and improve the police department's operations" in light of the uptick in police shootings and was admonished by the City's Mayor <u>the year before the underlying shooting</u> that led to the *Peatross* lawsuit. *Peatross*, 818 F.3d at 238. The Court relied heavily on this point to show knowing acquiescence by the Director. *See id.* at 238, 243.

Here, Plaintiff-Appellee alleges that Chief Davis stated that she was aware of a lack of supervision shortly after she took the job with MPD, but that she failed to act. Importantly, this statement was given *after* the incident giving rise to the lawsuit. Moreover, as explained *infra*, Plaintiff-Appellee failed to include the entirety of Chief Davis's statement, which was that she recognized the need for additional supervisors when she took the job in 2021, and that she asked the City administration for an additional 125 field supervisor positions before the incident giving rise to the lawsuit.

Further still, unlike in *Peatross* where the Mayor of Memphis "publicly admonished [the Director of the MPD] and described the MPD as 'unacceptable' and in need of outside scrutiny to analyze its shortcomings in recruitment, accountability, and training in ethical standards," here, Plaintiff has not alleged that the City administration admonished Chief Davis for any failures prior to this incident that would have put her on notice of certain failures that could lead to her being liable as a supervisor for Mr. Nichols's death.

Outside of the misleading and wholly inaccurate allegation at Paragraph 71 of the First Amended Complaint, the remaining allegations asserted against Chief Davis are insufficient to establish a causal connection to the resulting harm. In a strained attempt to hold Chief Davis personally liable for Mr. Nichols's injuries, Plaintiff-Appellee conflates Chief Davis's alleged encouragement of the

constitutional enforcement of traffic laws through proactive policing as encouraging police misconduct.

Plaintiff-Appellee's insufficient allegations fit more squarely into the Sixth Circuit's analysis in *Does v. Whitmer*, 69 F.4th 300 (6th Cir. 2023). In *Whitmer*, the Sixth Circuit reiterated that to state a claim of supervisory liability under Section 1983, a plaintiff must plausibly allege that a defendant "authorized, approved, or knowingly acquiesced in the unconstitutional conduct . . . of [her] subordinates through the execution of [her] job functions." *Whitmer*, 69 F.4th at 306 (quoting *Crawford*, 15 F.4th at 761). In fact, "[s]loppiness, recklessness, or negligence is insufficient to establish [supervisory] liability." *Id.* (citing *Garza*, 972 F.3d at 866). The Sixth Circuit noted that "[e]ach government official is liable only for her own misconduct, not for that of her subordinates." *Id.* (citing *Iqbal*, 556 U.S. at 677).

Like Plaintiff-Appellee here, the plaintiff in *Whitmer* attempted to draw a parallel between the facts presented in their complaint and *Peatross*. The Sixth Circuit rejected this attempt and noted:

> The allegations here are a far cry from those in *Peatross* and *Garza*. The plaintiffs here do not allege that they told Etue and Gaspar that the MSP was violating their rights, that the directors acknowledged problems, or that they attempted to cover up constitutional violations.

*Whitmer*, 69 F.4th at 308.

Like in *Whitmer*, Plaintiff-Appellee's allegations here are a far cry from those in *Peatross*. Plaintiff-Appellee does not plausibly allege that Chief Davis was deliberately indifferent to problems within MPD prior to the incident or that she was admonished by City leadership prior to the incident giving rise to the lawsuit.

In short, the district court erred in its reliance on *Peatross* in denying Chief Davis's Motion to Dismiss on the basis of qualified immunity, and this Court should reverse that ruling as a result.

## CONCLUSION

For the reasons stated above, Chief Davis requests that this Court reverse the district court's denial of her Motion to Dismiss on qualified immunity grounds, remanding the matter to the district court for entry of an order granting Chief Davis's Motion to Dismiss and entry of judgment in her favor on all claims against her.

Respectfully submitted,

*/s Bruce McMullen*

Bruce McMullen (Tenn. Bar #18126)
Jennie Vee Silk (Tenn. Bar #35319)
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, PC
165 Madison Avenue, Suite 2000
Memphis, TN 38103
Telephone: (901) 526-2000
bmcmullen@bakerdonelson.com
jsilk@bakerdonelson.com

*Attorneys for Defendant City of Memphis and
Defendant-Appellant Chief Cerelyn J. Davis*

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 11,183 words, as determined by Microsoft Word software, and excluding the parts of the brief exempted by Rule 32(f). This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in Microsoft Word format using 14-point Times New Roman proportionally spaced typed font.

## CERTIFICATE OF SERVICE

I hereby certify that on February 5, 2026 a copy of the foregoing Brief of Appellant was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to counsel of record for all parties indicated on the electronic filing receipt.

*/s Bruce McMullen*
Bruce McMullen

**ADDENDUM**

| Record Entry No. | Description | PageID # |
|---|---|---|
| 1 | Complaint | 1–139 |
| 277 | Amended Complaint | 3128, 3133, 3137–85, 3187–89 |
| 303 | The City Defendants' Motion to Dismiss Plaintiff's First Amended Complaint | 4253–54 |
| 303-1 | Memorandum of Law in Support of City Defendants' Motion to Dismiss | 4257–58, 4263–66 |
| 347 | Plaintiff's Omnibus Response in Opposition to Rule 12(b)(6) Motions Filed by Various Defendants | 4759–63 |
| 382 | City Defendants' Reply in Support of Motion to Dismiss First Amended Complaint | 5608–09 |
| 484 | Order Granting in Part and Denying in Part Defendants' Motions to Dismiss | 7062–65 |
| 507 | Notice of Appeal | 7631 |